[Civ. No. 8519.   Third Dist.   Feb. 17, 1955.]

SUSANA S. RIOS, as Administratrix, etc., Respondent, v.
KARAM CHAND, Appellant.

Guy A. Ciocca for Appellant.

Manwell & Manwell for Respondent.

SCHOTTKY, J.—Plaintiff commenced an action against defendant for the alleged wrongful death of her husband. The action was tried before the court without a jury and the court found in favor of plaintiff and awarded her damages in the sum of $15,000. Defendant's motion for a new trial was denied and he has appealed from the judgment.

Appellant makes three major contentions in arguing for a reversal of the judgment: (1) That the findings of the court are contrary to the evidence; (2) that the court erred in excluding certain evidence offered by appellant; (3) that the amount of damages awarded is excessive. Before discussing these contentions we shall give a brief summary of the evidence as shown by the record.

Appellant Karam Chand was a native of India and his wife, Cirila, was a Mexican, by whom he had four children, the oldest being 17 years of age. On December 27, 1951, he was living on a farm owned by himself and his wife and on this property he also conducted a store. He and his wife, because of marital difficulties, had separated, but both were living on the farm, Chand with the children in the farmhouse and Cirila, his wife, in a small detached dwelling. Cirila's sister Susie and her husband, Salomon Rios, were visiting her and had spent the afternoon there. About 7 o'clock in the evening they started to drive away. Their car became mired in the mud and they were unable to leave. They asked one Harry Tabata, a Japanese employee of Chand, to help them and he went to look at the situation. While he, Salomon, Susie and Cirila were grouped about the car, Chand came walking toward them. He had been in the house a considerable time and on entering had early learned of the presence of Salomon and Susie on the property despite his having frequently told Salomon not to come there. He took no action, however, but ate dinner with his family, then retired to his living room when another employee, Jack Yokum, came in and told him that there was a car stuck outside. He put on his jacket in which there was a small flashlight and a loaded automatic pistol and walked outside through the yard and to the group around the car.

From that point on the testimony as to what occurred is much in conflict. Susie testified that she saw Chand approach the group, heard him curse Salomon and declare his intention to kill him, saw him walk directly up to Salomon, shine the light in his eyes and, at point-blank range, fire two bullets into his chest. She said Salomon turned and ran

and Chand pursued him, declaring his intention to "finish" him "now." Salomon disappeared in the darkness and Susie sought him, finding him close to Tabata's house some little distance from where his car was mired. She then phoned for an ambulance and returning to the scene heard Cirila talking to Chand, telling him to forget everything and call a doctor, and she heard Chand reply "Who care," whereupon he walked to the house.

Appellant's former wife, Cirila, from whom he had been divorced between the date of the shooting and the trial of the instant case, was called as a witness for respondent, but, upon objection being made by appellant, was not permitted to testify.

Appellant did not deny the shooting but claimed that he was acting in self-defense. He testified that he merely left his house and went into the yard to see if he could help about the mired car; that he carried the flashlight in his hand, leaving the pistol in his pocket; that he reached the group around the car; that he walked directly toward Salomon, saying, "What are you doing here?"; that Susie said something in Spanish he could not understand and then Salomon, saying, "I am going to fix you up now, Karam," grasped Chand's throat, stopping his breathing and causing blindness; that he tried to break Salomon's grasp, but could not, then reached for his gun and shot; that he fired to save his own life, which he was in fear of losing; that Salomon did not release his hold after the first shot and that he, Chand, fired again; that he did not know if he had hit Salomon, but Salomon released his hold after the second shot was fired and went away; that as soon as he got his breath he, Chand, called for help and his four children came out of the house and ran to him; that he said nothing to Susie at any time and had never said during the entire affair that he was going to finish Salomon; that he returned to his house to call the sheriff, but on taking down the telephone heard someone on an extension line calling that officer; that he ordered a doctor called for Salomon.

Salomon lived about 36 hours after the shooting. His attending physician testified that he died from a bullet wound which had caused a paralyzed bowel, a paralytic ileus.

There was other evidence tending to support the testimony of respondent. Sheriff Carpenter and Deputy Sheriff Blackburn who went to the scene of shooting very shortly thereafter both testified that they observed the appearance of appel-

lant and that his necktie and collar were in place and that they noticed no bruises or scratches on his face or neck, which testimony might cast some doubt on appellant's testimony that Salomon Rios grasped him by the throat and choked him, stopping his breathing and causing blindness.

Respondent and appellant were the only witnesses who were in a position to see what took place at the time of the shooting. It is at once apparent that there was a sharp conflict in the evidence which it was the duty of the trial court to resolve. Appellant calls attention to the fact that appellant was a small man, 5 feet, 3 inches, in height and weighing only 130 pounds, while respondent's deceased husband was 6 feet tall and weighed 215 pounds, and also calls attention to other parts of the testimony which he contends supports his contention that he acted in self-defense. The following quotation from appellant's opening brief is sufficient to demonstrate that appellant's contention as to the insufficiency of the evidence is devoid of any merit:

"It is of the utmost importance that it be here noted that the record as to what happened on the evening of December 27, 1951 at or about the hour of 8:30 p. m., the time of the fatal shooting, is bare of any evidence or testimony from which any inference or presumption may be drawn as to what the facts were at that time other than from the testimony of the appellant and the respondent who is seeking damages in the sum of $100,000. There is not one iota of testimony in the whole record either supporting or contradicting the testimony of these parties. The testimony of respondent in this connection is diametrically opposed to the testimony of appellant."

Appellant next contends that the court erred in sustaining respondent's objection to the following question asked of the sheriff of Sutter County: "Did the application to you state why the gun was being obtained?" The evidence showed that appellant had obtained a permit to carry a gun from the sheriff's office several months prior to the shooting, and appellant testified that he obtained the permit for his own protection. Appellant's counsel states that he wanted to show that the permit to carry the gun was obtained to protect appellant against the threats of another man and that his having the gun was innocent so far as taking the life of Salomon Rios was concerned. We believe that the court's ruling was correct upon the ground that any such statement by appellant would be a self-serving declaration,

but in any event it is difficult to understand how appellant could have been prejudiced by the ruling or how it could constitute reversible error.

■ Appellant contends also that the court improperly excluded evidence going to the interest, bias and prejudice of respondent and laying the foundation for threats made by the deceased bearing upon the question of who was the aggressor. In his cross-examination of respondent, appellant's counsel sought to bring out the fact that respondent had a very strong bias and prejudice against appellant. Respondent testified that appellant had killed her husband and that her feeling toward him was "no good." Appellant's counsel sought to have her admit that she was angry with appellant because he had reported the presence of her husband and herself to the immigration authorities and also sought to show that respondent had influenced appellant's wife against him. Objections to questions along this line were first sustained by the court. While the court should have allowed the questions to be answered, it is clear that respondent was biased and prejudiced against appellant. It also appeared in appellant's own testimony that he had reported the presence of respondent and her husband to the immigration authorities, and this fact, together with the fact that appellant had shot her husband and that she was seeking to recover damages from appellant for her husband's death, would of course cause a trial judge to weigh her testimony very carefully. We are satisfied that appellant suffered no prejudicial effect from said ruling.

■ Appellant next contends that the court erroneously excluded evidence pertaining to the reputation of respondent for truth, honesty and integrity.

Witness Lewis D. Knesek, an investigator for the United States Immigration and Naturalization Service, testified that he was on the Susana Rios case for approximately four months; and since the date of her arrest had been the person in charge of her case and had been generally familiar with it since that time and that his duties, from time to time, brought him to Sutter County and around Marysville in that district, and he had heard discussed in the vicinity of Yuba City and Marysville and even in Sacramento the general reputation of Susana Rios for truth, honesty and integrity. Thereupon he was asked: "Do you know the general reputation of Susana Rios for truth, honesty and integrity, yes or no?" Counsel for respondent objected to the question

upon the ground that a person testifying to the reputation of a witness must himself reside in the same community as the witness. The court sustained the objection, stating: "It is not intended that someone who lives forty or fifty or a hundred miles away and who has never lived within the community, only discussing it with a limited number of persons and in a certain circle, can give that testimony." Counsel for appellant then made an offer of proof that the witness would testify that the reputation of respondent was bad.

In so ruling the court erred because there is no requirement that a so-called character witness must reside in the same community as the person as to whose reputation he testified. Section 2051 of the Code of Civil Procedure provides that a witness may be impeached "by evidence that his general reputation for truth, honesty and integrity is bad."

If a witness states that he knows the general reputation of a person in the community in which such person resides he should be permitted to answer a question as to whether such reputation is good or bad. Upon cross-examination he may be questioned as to the basis of his opinion and if it appears that he has no knowledge upon which to base his opinion his testimony may be stricken. However, it may, and frequently does, happen that one person who goes into a community for the purpose of ascertaining the general reputation of a person in that community may by diligent inquiry from the representative people gain a fairly accurate estimate of the general reputation of that person in the community. The rule is well expressed in Wigmore on Evidence, volume III, 3d edition, section 692, page 18, as follows:

"The admissible reputation is that which is built up in the neighborhood of a man's domicile or in the circle where his livelihood is followed; and it is of slow formation. It is the sum of all that is said or not said for or against him. Consequently, it used to be ruled that a reputation can be adequately learned only by the *witness' residence* in the place, not by a mere visit of inquiry, or by a casual sojourn, or by a conversation with a resident who reports the reputation: . . .

"But in modern days of organized investigation and research it is easy to see that this original common law rule is too strict. Systematic inquiry by a person coming from outside will often be a better source of knowledge than the casual opportunities of a neighbor or a friend; the only

reason for distrust exists when the inquirer is a paid partisan agent who seeks evidence of one purport only.''

If there had been a jury trial in the instant case and the evidence as to liability were not so strong, the error just discussed might be serious enough to require a reversal of the judgment. ■ However, where, as in the instant case, respondent who was seeking to recover damages from appellant admitted her bias and prejudice against appellant, we do not believe appellant was prejudiced by the fact that the witness Knesek was not permitted to testify that her reputation for truth, honesty and integrity was bad. Such evidence would have constituted only a cumulative attack on her credibility, and we are satisfied from a study of the entire record that no miscarriage of justice resulted.

■ Appellant argues also that he was denied the right of a fair and impartial trial by the prejudice of the trial judge.

The court in discussing an objection to proposed testimony with counsel for appellant stated:

''I know you do, but I think under the objection—she might have been very unfriendly toward Mr. Chand and so might he, and as you know, there has been brought into this another case, and while it is not evidence here, I can not exclude from my mind things I learned last December, was it?''

In discussing another objection, the court stated:

''I will grant the motion. As indicated before, this isn't a Jury trial. I have heard it for what possible harm might be done, but still I don't think there has been anything prejudicial because of the fact that it has been freely admitted in my presence not only in this proceeding but in others that the defendant stands convicted of murder, and I know that there is lots of evidence in that case that probably doesn't come before me in this case. . . .''

However, it must be borne in mind that in the December before the trial of the instant case began in March, appellant had made a motion for a continuance before the same trial judge upon the ground that the appeal of appellant from a conviction of murder in the second degree in the criminal case was pending in this court, and that on the first day of the trial counsel for appellant had made a motion for a further continuance upon the ground that the decision of this court affirming said judgment of conviction was not yet final. The quoted remarks of the court must therefore be

construed in the light of that situation, and the fact that no assignment of prejudice or misconduct was made at the time by the able and experienced counsel who represented appellant at the trial convinces us that counsel did not consider that appellant was prejudiced thereby.

Appellant's final contention that the award of $15,000 damages was excessive requires little comment. Respondent's deceased husband was 28 years of age and respondent was 27 years of age. He had supported his wife subsequent to their marriage. There was evidence that he earned as much as $1.00 an hour. He was a farm laborer, and there is evidence in the record he had followed agricultural activities since he was a boy. Appellant argues that said husband was an alien, about to be deported to Mexico, and that his earning capacity in Mexico would be very small. In view of the fact that the husband's expectancy of life was 39.49 years, it is clear that the court must have taken into consideration these factors mentioned by appellant or the award of damages would no doubt have been much larger.

The judgment is affirmed.

Van Dyke, P. J., and Peek, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied April 13, 1955.