[No. A062338. First Dist., Div. Two. June 27, 1995.]

MARIE CATCHPOLE, Plaintiff and Appellant, v.
RUDY BRANNON et al., Defendants and Respondents.

238

## COUNSEL

Zigler & Ciesar, Robert A. Zigler, Karen G. Ciesar, Howard, Rice, Nemerovski, Canady, Falk & Rabkin, G. Charles Robb, Theresa M. Beiner and Annette L. Hurst for Plaintiff and Appellant.

Rudy Brannon, in pro. per., Mitchell, Dedekam & Angell and Paul A. Brisso for Defendants and Respondents.

## OPINION

KLINE, P. J.—This case presents the unusual question whether the alleged gender bias of the trial judge requires us to set aside his judgment.

Appellant, Marie Catchpole, commenced this litigation in the Superior Court of Humboldt County, asserting claims of sexual harassment, assault and battery, and intentional and negligent infliction of emotional distress against respondents, Melody and Jay Rane, owners of Eureka Burger King (EBK), where appellant had been employed; R-5 Enterprises (doing business as Eureka Burger King), the Ranes' corporation; Kent Greenhalgh, a manager at EBK; and Rudy Brannon, a former assistant manager at EBK and his wife, Lorraine Brannon. Judgment against appellant was rendered by a superior court judge sitting without a jury. Appellant contends the judgment must be reversed not only because of the gender bias of the trial judge, but due to the absence of substantial evidence to support the court's findings that she was not sexually harassed by being subject to a hostile work environment, that she was not retaliated against after reporting Brannon's assault, and that the owners of EBK are not liable for the harassment she suffered. Appellant also challenges the finding that she suffered no damages as a result of respondents' conduct.

It is unnecessary for us to inquire into the sufficiency of the evidence to support the findings because we conclude that the allegations of judicial gender bias are meritorious and reverse on that basis.

# I.

The facts adduced at trial are as follows.[1] In September 1987, appellant applied for and obtained employment at EBK, a Burger King franchise located in Eureka. Appellant, then an 18-year-old freshman at Humboldt State University, had received a scholarship from Burger King Corporation which required that she be employed a minimum of 15 hours a week at a Burger King restaurant. EBK owners Melody and Jay Rane lived in Reno, Nevada, and were at the restaurant only two or three days each month. Kent Greenhalgh was the manager of EBK and Rudy Brannon was one of several assistant managers with whom appellant worked.

Appellant testified she was subjected to a hostile work environment at EBK, in which supervisors, particularly Brannon, encouraged employees to discuss sexual matters, to touch each other, and to "rate" customers' attractiveness. Several former employees also testified that Brannon flirted with female employees, talked about their bodies, showed them lingerie magazines and ads for X-rated strip shows, offered unsolicited "advice" about sexual matters, and touched them inappropriately. In addition, a former employee and two female friends testified that they had gone to Brannon's home on numerous occasions, where Brannon and his wife provided alcohol and marijuana and showed them pornographic movies. EBK had a nonfraternization policy, which prohibited managers from associating with employees away from EBK. Brannon had earlier been reprimanded for inviting employees to his house in violation of that policy. Melody Rane, Greenhalgh, and several EBK employees testified that appellant was difficult to get along with and rude to other employees.

Appellant testified that in the early morning of December 11, 1987, at Brannon's insistence, she went to his home after work to discuss her problems with coworkers. Brannon forcibly removed her clothes and performed an act of oral sex on her, after which he forced her to orally copulate him.

Nearly two months later, on February 2, 1988, appellant mentioned the assault to another EBK employee, who then reported it to the assistant manager on duty, who in turn called Greenhalgh. Greenhalgh came to the restaurant and phoned owner Melody Rane. At Rane and Greenhalgh's urging, appellant took her complaint to the Eureka Police Department. Police

---

[1]Because the facts of the underlying case are important only insofar as they furnish the context for the gender bias claim upon which our decision is based, we provide only a summary of the facts pertinent to the issues raised at trial. Facts pertaining to the trial judge's conduct during trial are separately described later in this opinion.

Detective David Parris testified that Brannon admitted the assault "[i]n so many words" during a controlled call by appellant from the police station. Brannon was fired the next day. He later received a letter from the Ranes explaining that he was terminated due to "sexual harassment and fraternization." The letter noted that "[t]hree female employees have come forward with written complaints of sexual harassment by you."

Appellant's account of the assault and events leading up to it was disputed. For example, Brannon denied appellant came to his house on December 11, claiming that she had been to his house only once, on November 19, 1987, when she followed him home from work because she was upset with her coworkers.

After appellant reported Brannon's assault, she was allegedly subjected to retaliatory harassment by numerous employees at EBK who blamed her for his dismissal. These acts of retaliation, about which she complained repeatedly, were assertedly never adequately addressed by management. While acknowledging some tension between appellant and employees who had been friendly with Brannon, Greenhalgh and others employed at EBK at the time testified that they saw no retaliatory harassment of appellant. Appellant requested a leave of absence in May 1988, and did not return to work at EBK.

Two expert witnesses testified for appellant. Dr. Paul Berg, a clinical psychologist, concluded that appellant suffered from posttraumatic stress disorder as a result of the December 11, 1987, assault. He also opined that appellant "tended to be passive, and not able to assert herself normally." According to Dr. Berg, these aspects of her personality "make her more vulnerable . . . to victimization and made her less capable of recovering from it as a result." Dr. Berg stated that since the sexual harassment appellant suffered at EBK, "she's been virtually continuously in treatment with a number of different practitioners. Her life has changed in the most dramatic ways. At least on the surface. She's no longer able to take a full load in school. Her ability to work has been spotty and choppy and tangent and I think more important she's undergone a very severe decompensation of her abilities to relate, to feel normal, to have normal interactions and she has become an extremely sick young lady." Diana Livingston, executive director of the North Coast Rape Crisis Team, recounted that appellant came to her office for treatment in early 1988 and complained of the harassment, assault, and retaliatory conduct resulting from her employment at EBK. According to Livingston, appellant exhibited signs of rape trauma syndrome.

Following an eight-day trial without a jury, the judge found that appellant's testimony was not credible, that none of her claims of harassment

were supported by other witnesses, and, moreover, that the pre-February 2, 1988, harassment claims were not made prior to trial, were not made to any manager except Brannon, and were not supported by any other witness. The judge also found appellant's account of the alleged assault by Brannon "simply not believable." Finally, the judge acknowledged appellant was shunned by coworkers after Brannon was fired, but found it was not retaliatory and that appellant had not shown any sexual harassment after February 2, 1988. In addition to his findings of no liability, the judge concluded appellant failed to show damage attributable to her claims. Noting appellant had been molested as a child, the judge found it "impossible to separate her present condition from the past."

## II.

Before confronting the allegations of gender bias we must address respondents' contention that appellant had a duty to object or to raise that issue in some other appropriate fashion in the trial court and waived the claim by not doing so.

■ We are aware of no such obligation. Few more daunting responsibilities could be imposed on counsel than the duty to confront a judge with his or her alleged gender bias in presiding at trial. The risk of offending the court and the doubt whether the problem could be cured by objection might discourage the assertion of even meritorious claims. Requiring the issue to be raised at trial would therefore have the unjust effect of insulating judges from accountability for bias. (Cf. *People* v. *McAlister* (1985) 167 Cal.App.3d 633, 644 [213 Cal.Rptr. 271].) We do not mean to suggest, of course, that trial counsel are not free to object to judicial statements or conduct on the basis of alleged gender bias, which in some instances may be the better course. We hold simply that the issue may be raised on appeal regardless whether objection was made below. As Witkin has observed, the rule that an appellate court will not consider points not raised at trial does not apply to "[a] matter involving the public interest or the due administration of justice." (9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 315, p. 326.) The issue of judicial gender bias obviously involves *both* a public interest *and* the due administration of justice.

Respondents' reliance on *Rios* v. *Chand* (1955) 130 Cal.App.2d 833 [280 P.2d 47] is misplaced, as that case does not hold that the issue of judicial bias must be raised at trial. The court simply found that, in the circumstances of that case, the failure to raise the issue below was an indication that the appellant's experienced trial counsel did not consider appellant to have been prejudiced by the trial court's questionable remarks. (*Id.* at pp. 840-841.)

Appellant's failure to raise the issue of gender bias at trial here does not preclude our addressing it now. Indeed, one court has vindicated a claim of judicial bias raised for the first time during oral argument on appeal. (*In re Marriage of Iverson* (1992) 11 Cal.App.4th 1495, 1504 [15 Cal.Rptr.2d 70] (conc. opn. of Moore, J.).)

## III.

 Whatever disagreement there may be in our jurisprudence as to the scope of the phrase "due process of law," there is no dispute that it minimally contemplates the opportunity to be fully and fairly heard before an impartial decisionmaker. The presence of judicial partiality is, of course, most pernicious where—as claimed here—it bears directly on the matter to be decided. Reversal has therefore been required in cases alleging gender bias[2] where it is "reasonably clear that [the trial judge] entertained preconceptions about the parties because of their gender . . . [which make] it impossible for [a party] to receive a fair trial." (*In re Marriage of Iverson*, *supra*, 11 Cal.App.4th at p. 1499.)

Asserting that reversal is mandated not only where actual bias is found, but also where the judge's actions give rise to the appearance of bias, appellant relies on the venerable principle that " '[t]he trial of a case should not only be fair in fact, but it should also appear to be fair. And where the contrary appears, it shocks the judicial instinct to allow the judgment to stand.' " (*Webber* v. *Webber* (1948) 33 Cal.2d 153, 155 [199 P.2d 934], quoting *Pratt* v. *Pratt* (1903) 141 Cal. 247, 252 [74 P. 742].)

Respondents, on the other hand, argue that actual bias must be shown before a judgment can be reversed, citing *Shakin* v. *Board of Medical Examiners* (1967) 254 Cal.App.2d 102, 117 [62 Cal.Rptr. 274, 23 A.L.R.3d 1398], for the proposition that "[b]ias and prejudice are never implied and must be established by clear averments." *Shakin* was decided under the prior statute governing judicial disqualification—Code of Civil Procedure former

---

[2]For purposes of this opinion, we accept the definition of "gender bias" developed by the Judicial Council Advisory Committee on Gender Bias in the Courts, which provides that "gender bias includes behavior or decision making of participants in the justice system which is based on or reveals (1) stereotypical attitudes about the nature and roles of women and men; (2) cultural perceptions of their relative worth; and (3) myths and misconceptions about the social and economic realities encountered by both sexes." (*Judicial Council of Cal. Achieving Equal Justice for Women and Men in the Courts: The Draft Rep. of the Judicial Council Advisory Committee on Gender Bias in the Courts* (1990) at p. 2 [hereafter Draft Report of the Judicial Council].) This report was accepted on November 16, 1990, by the Judicial Council, which unanimously adopted its recommendation. The final report, which will be substantially identical to the Draft Report, will be published shortly by the Judicial Council Standing Committee on Access and Fairness.

section 170, subdivision (a)(5)[3]—which had been construed to require a showing of bias in fact. (See *Andrews* v. *Agricultural Labor Relations Bd.* (1981) 28 Cal.3d 781, 792-793 [171 Cal.Rptr. 590, 623 P.2d 151].) That statute was, however, replaced by section 170.1, subdivision (a)(6)(C) in 1984. ■ The new statute altered the requirement by making the disqualification standard " 'fundamentally an objective one. It represents a legislative judgment that due to the sensitivity of the question and inherent difficulties of proof as well as the importance of public confidence in the judicial system, the issue is not limited to the existence of an actual bias. Rather, if a reasonable man [or woman] would entertain doubts concerning the judge's impartiality, disqualification is mandated. "To ensure that the proceedings appear to the public to be impartial and hence worthy of their confidence, the situation must be viewed through the eyes of the objective person." [Citation.].' " (*In re Marriage of Iverson, supra,* 11 Cal.App.4th at p. 1505 (conc. opn. of Moore, J.), quoting *United Farm Workers of America* v. *Superior Court* (1985) 170 Cal.App.3d 97, 104-105 [216 Cal.Rptr. 4]; see also *Yagman* v. *Republic Ins.* (9th Cir. 1993) 987 F.2d 622, 626 [under federal statutes "recusal is appropriate where 'a reasonable person with knowledge of all the facts would conclude that the judge's impartiality might reasonably be questioned.' [Citations.]"].) "The reason given for the change [in the statute] is the difficulty in showing that a judge is biased unless the judge so admits. In addition, public perceptions of justice are not furthered when a judge who is reasonably thought to be biased in a matter hears the case." (*United Farm Workers of America* v. *Superior Court, supra,* 170 Cal.App.3d at p. 103.)

■ Although the case before us does not present the question of disqualification, the disqualification cases and statutes are nonetheless apposite. As the concurring opinion in *Iverson* makes clear, the reasons justifying an objective standard set forth in *United Farm Workers* are as applicable to the situation presented in this case as to the issue of disqualification. (Cf. *Betz* v. *Pankow* (1995) 31 Cal.App.4th 1503, 1512 [38 Cal.Rptr.2d 107].) This is shown by the fact that the same objective test is employed to determine whether a judge has avoided impropriety and the appearance thereof, as mandated by canon 2 of the California Code of Judicial Conduct. The commentary to canon 2 provides that "[t]he test for the appearance of impropriety is whether a person aware of the facts might reasonably entertain a doubt that the judge would be able to act with integrity, impartiality, and competence."

■ The Code of Judicial Conduct also acknowledges that the absence of judicial impartiality may be based on gender bias. Thus, in order to advance

---

[3]Unless otherwise indicated, all further statutory references are to the Code of Civil Procedure.

the precept that "A Judge Should Perform the Duties of Judicial Office Impartially and Diligently" (Cal. Code Jud. Conduct, canon 3), the code directs that "[a] judge should not, in the performance of judicial duties, by words or conduct, manifest bias or prejudice, including but not limited to bias or prejudice based upon . . . sex . . . ." (*Id.*, canon 3B(5).) It bears noting that allegations of such bias or prejudice are particularly disquieting where, as in this case, they relate to factual rather than legal issues, because ". . . a trial judge's factual findings are generally accorded considerable deference whereas legal rulings are subject to plenary appellate review." (*United Farm Workers of America* v. *Superior Court, supra,* 170 Cal.App.3d at pp. 104-105, citing *State of Idaho* v. *Freeman* (D.Idaho 1981) 507 F.Supp. 706, 728 and *Hurtado* v. *Statewide Home Loan Co.* (1985) 167 Cal.App.3d 1019, 1023-1025 [213 Cal.Rptr. 712].)

Where the average person could well entertain doubt whether the trial judge was impartial, appellate courts are not required to speculate whether the bias was actual or merely apparent, or whether the result would have been the same if the evidence had been impartially considered and the matter dispassionately decided (*Webber* v. *Webber, supra,* 33 Cal.2d at pp. 161-162; *Pratt* v. *Pratt, supra,* 141 Cal. at p. 252), but should reverse the judgment and remand the matter to a different judge for a new trial on all issues. (§§ 170.1, subd. (c), 187.)[4]

## IV.

*In re Marriage of Iverson, supra,* 11 Cal.App.4th at pages 1499, 1502, which held that the trial judge's gender-based preconceptions deprived the female litigant of a fair trial in a marital dissolution case, is instructive as to the manner in which gender bias may be shown and the nature of the showing that will warrant reversal.

In finding against the wife on several issues, including the validity of a premarital agreement and the determination as to which party had initiated the marriage, the trial judge in *Iverson* remarked that the wife, whom he

[4]Section 170.1, subdivision (c), provides that "[a]t the request of a party or on its own motion an appellate court shall consider whether in the interests of justice it should direct that further proceedings be heard before a trial judge other than the judge whose judgment or order was reviewed by the appellate court." Although section 170.1 nominally pertains to situations in which a trial judge is disqualified *ab initio*, no reason appears why it should not apply as well in situations such as that here presented. In any case, the court in *Iverson* found independent appellate authority to remand a matter for retrial by a different judge under section 187, which provides in material part that "if the course of proceeding be not specifically pointed out by this code or the statute, any suitable process or mode of proceeding may be adopted which may appear most conformable to the spirit of this code." (*In re Marriage of Iverson, supra,* 11 Cal.App.4th at p. 1502.)

referred to as a "lovely girl," had "nothing going for her except for her physical attractiveness." (*In re Marriage of Iverson, supra,* 11 Cal.App.4th at p. 1498.) "His reasoning appears to have been that 'lovely' women are the ones who ask wealthy men who do not look like 'Adonis' to marry, and therefore [the wife] was not credible when she testified [that the husband] asked her to marry him." (*Id.* at p. 1500.) Referring to the fact that the couple was living together before their marriage, the judge commented, "And why, in heaven's name, do you buy the cow when you get the milk free . . . ." (*Id.* at p. 1499.)

Based on these comments, the court of appeal found the trial judge had not only used language indicating gender bias, but also rendered judgment on the basis of gender-based stereotypes. (*In re Marriage of Iverson, supra,* 11 Cal.App.4th at p. 1500.) The court concluded that the judge showed a "predetermined disposition" to rule against the wife based on her status as a woman. (*Id.* at p. 1501, citing *Webber* v. *Webber, supra,* 33 Cal.2d at p. 158.) The judgment was reversed and the matter remanded for a new trial before a different judge. (11 Cal.App.4th at p. 1503.)

In a separate concurring opinion, Justice Moore disagreed that the trial judge's comments, read in context, established actual bias, but reached the same result, concluding that "[i]t matters not whether there was actual bias, appearance of bias being sufficient to warrant reversal." (*In re Marriage of Iverson, supra,* 11 Cal.App.4th at p. 1503 (conc. opn. of Moore, J.).)

Respondents argue that *Iverson* is inapposite because the trial judge in that case improperly injected sexual conduct and gender factors into a case where such matters should not have been at issue. ▮ This contention—in effect that, because sexual factors and conduct were at issue in the present case, the trial judge's inquiry is automatically immune to claims of gender bias—cannot be sustained. Gender bias must not be countenanced in any case, but if there is any type of proceeding that might call for more rigorous review it is precisely the type respondents would insulate from scrutiny, because judicial gender bias appears most likely to arise in litigation in which gender is material, such as sexual harassment and discrimination cases.[5]

---

[5]The Draft Report of the Judicial Council notes that there appears to be an uncommon degree of judicial hostility "to certain causes of action uniquely involving women, such as sex discrimination cases and sexual harassment cases. . . . [¶] Attorneys who practice in this area . . . generally believed that the hostility toward these causes of action influenced judicial rulings in the areas where judges exercise discretion." (Draft Rep. of the Judicial Council, *supra,* at pp. 24-25.) A parallel study of gender bias in the federal judiciary similarly found that "[i]n sexual harassment or discrimination cases before a male judge, plaintiffs' lawyers report a minimization of their clients' trauma and 'an across the board lack of understanding'

## V.

 Appellant's claim of gender bias rests on the related contentions that the trial judge displayed a belief that sexual harassment cases are relatively unimportant and invoked sexual stereotypes in evaluating appellant's behavior and credibility.

There is, unfortunately, substance to these claims. Two factors create the strong impression of gender bias. The first is the tenor of the proceedings and impatience the trial judge repeatedly expressed, which conveyed the sense he considered sexual harassment cases "detrimental to everyone concerned" and a misuse of the judicial system. The second factor relates to the assessment of appellant's credibility. The court's finding that appellant was not believable, the primary justification provided for the judgment against her, rests on stereotyped thinking about women and misconceptions of the social and economic realities many women confront. Considered as a whole, the court's comments reflect a predetermined disposition to rule against appellant based on her status as a woman. (*In re Marriage of Iverson, supra,* 11 Cal.App.4th at p. 1501; *Webber* v. *Webber, supra,* 33 Cal.2d at p. 158.) The judge's expressed hostility to sexual harassment cases and the stereotypical attitudes and misconceptions he adopted provide a reasonable person ample basis upon which to doubt whether appellant received a fair trial.

### A.

We cannot set forth all the comments made over the course of the eight-day trial that collectively create the impression of judicial gender bias and cast doubt on the court's impartiality. One of the best illustrations of the trial judge's reliance on gender-based preconceptions was provided early on, after respondents completed their cross-examination of appellant, who was the first witness. The trial judge's lengthy interrogation of her differed markedly from the treatment he accorded others who testified, most of whom, including respondent Brannon, were asked no questions. The court's initial questions set the tone for what was to follow:

"THE COURT: Okay. No doubt this particular lawsuit has been difficult for you, and embarrassing for you, and I assume a lot of people in your position would have chosen to not go forward with a lawsuit of this sort. Can you tell me why you decided to do it?

as to the female plaintiff's situation and point of view." (Ninth Circuit Gender Bias Task Force, The Effects of Gender in the Federal Courts: The Final Report of the Ninth Circuit Gender Bias Task Force (July 1993) [hereafter Report of the Ninth Circuit Gender Bias Task Force] at p. 127.) (The complete Report of the Ninth Circuit Gender Bias Task Force, together with appendices, is set forth in 67 So.Cal.L.Rev. at pp. 745-1106 (1993).)

"THE WITNESS [appellant]: Yes. Because I felt I needed to do something to get in control of the situation. I felt so humiliated and so down trodden, that I needed a way to overcome this. Um, I wanted to set right what was wrong. I—I wanted to, um, be able to have a chance to say what I felt was wrong; what had been done to me, and the injustices I felt at the time. I—I felt they were never addressed, and now is my chance to address them. Whether I win or not, I'm still going to win in my heart, because I was able to sit here and address the people that wronged me.

"THE COURT: Okay. You indicated in your testimony—I don't know whether it was Monday or yesterday—that your father, to this day, feels that you shouldn't have been where you were on December the 11th. He somehow blames you for what happened; is that right?

"THE WITNESS: Did I say that in my testimony?

"THE COURT: I thought you did.

"THE WITNESS: Um—

"THE COURT: At least that's what I got out of what you said.

"THE WITNESS: My—my father felt—um, he—he didn't understand how I had gotten into this mess. And—and, um, he is very upset about it. And I don't know whether he thinks I should have been or should not have been.

"THE COURT: Okay. Um, maybe I assumed something that a father might feel that way. [¶] Is this suit in any way connected with how your father feels about the situation? You want to prove something to him?

"THE WITNESS: I—I never thought of that.

"THE COURT: Okay. Fine. You understand that regardless of what the motivations are within yourself, that the allegations that you made against these people are very serious allegations?

"THE WITNESS: Yes.

"THE COURT: Okay. And you understand that if Mr. Brannon's opening statement is correct, he has already lost, I guess, quite a bit of money, and been subject to certain trials and tribulations as a result of those allegations, correct?

"THE WITNESS: Yes.

"The Court: Okay. Likewise, I assume that you understand that Kent and the Ranes, and the other crew members have been subjected to the claims of harassment; um, that they either harassed you or failed to prevent the harassment, and I assume you understand that in many ways it's going to be your word against all of those other people?

"The Witness: No.

"The Court: You don't understand that?

"The Witness: No, I—

"The Court: Okay. Go ahead.

"The Witness: Um, I have corroboration.

"The Court: Okay. I'm not saying you don't, I'm just saying that you need—I assume that you understand that the Brannons are going to say you weren't at their house on December 11th; that Kent's going to say that most of what you said about him is incorrect, and probably a lot of these crew members are going to come in here and say they didn't do anything wrong, either. So in some ways, um, absent—I don't know what corroboration you have, but absent that corroboration, it's still a lot of your word against their word. [¶] Do you understand that?

"The Witness: Yes.

"The Court: Okay. So you understand that your testimony is going to be looked at very carefully, and that you can't simply tell me that the conversation on November 19th, 1987 was A, B, C and D. If you can't remember that conversation, in total—in other words, you can't just paraphrase a conversation. [¶] Do you understand that?

"The Witness: Yes."

These initial queries, like much of the later questioning, conform to what the Draft Report of the Judicial Council condemns as a "fatherly" tone, "either courtly and patronizing or harsh and reprimanding." (Draft Rep. of the Judicial Council, *supra*, at p. 6; see also, Report of the Ninth Circuit Gender Bias Task Force, *supra*, at p. 197.) It is not only the tone of this inquiry that is questionable. Without a good faith reasonable basis for believing the question would elicit relevant or impeaching evidence (which does not appear), counsel would not have been permitted to inquire, nor

should the court have asked, whether appellant appreciates the seriousness of her claims and the burdens they have imposed on her assailant and other respondents. Coming from the court, questions such as this suggest appellant's sexual harassment claims might not be disinterestedly entertained on the merits, but decided on the basis of extralegal preconceptions. The intimidating admonitions that appellant must remember exactly what was said at the time of the assault (which took place five years prior to trial) and could not paraphrase conversations, and that "your testimony is going to be looked at very carefully," also reflect hostility to sexual harassment claims by implying they are subjected to uncommonly high evidentiary requirements.

Analyses of judicial gender bias also criticize excessive judicial impatience with sexual harassment and discrimination cases, which is also considered a sign of hostility to such claims.[6] Judicial impatience was very much present in this case. For example, immediately following the opening statements of counsel, the judge asked appellant's counsel how long the trial was going to take.

"MR. ZIGLER: I think we're going to have trouble finishing next week, Your Honor.

"THE COURT: Well, how many witnesses do you have?

"MR. ZIGLER: Potentially twenty-two, Your Honor.

"THE COURT: Jesus Christ. [¶] Well, there is a limited amount of judicial resource here. If you think it's worth it, Mr. Zigler, you may proceed."

After Diana Livingston, director of the North Coast Rape Crisis Team, described various symptoms of rape trauma syndrome and opined that appellant exhibited all those symptoms, the judge derided her testimony by suggesting the witness "should check and see if they come in with a big 'R'

---

[6]Thus, for example, the Report of the Ninth Circuit Gender Bias Task Force, *supra*, found that "[t]he approach to sexual harassment cases taken by the district courts often reflects both a restrictive application of the law to sex discrimination cases in general and an impatience with these cases. (*Id.* at p. 126.) This report goes on to describe the view of participants in its study that "paternalistic" male judges are excessively impatient in sexual harassment and discrimination cases, because they see these matter as " 'small stakes' cases." (*Id.* at p. 127, fns. omitted.) Participants in the Ninth Circuit study also noted that judicial impatience "works to the disadvantage of white female or all African-American plaintiffs because a discrimination case often requires time to educate the judge or the jury, 'so you have to figure out a way to get the evidence in front of the judge before he knocks you off at the knees.' " (*Id.* at p. 128; see also, Draft Report of the Judicial Council, *supra*, at p. 6.)

stamped on their forehead in red letters, and then we'll all know." Nothing in the testimony of the witness appears to have called for this demeaning allusion to Hawthorne's scarlet letter. When Livingston concluded her testimony, appellant's attorney asked the judge if she could remain in the courtroom. The judge responded: "If she's excused she can sit here. If she wants to listen to all of this nonsense, she's welcome."

In short, the substance and tone of many of the questions the court put to appellant, and the disdain and impatience the court repeatedly displayed, contribute to the impressions that judicial gender bias was present in this case and that the matter was not impartially decided.

We are mindful of the demands on overburdened trial judges and the frustration they sometimes feel when impeded in the discharge of their heavy responsibilities. Understandable expressions of such frustration rarely warrant appellate attention. We must also keep in mind, however, that the source of judicial authority lies ultimately in the faith of the people that a fair hearing may be had. Judicial behavior inimical to that necessary perception can never be countenanced and may well provide a basis for reversal even if not the product of gender bias. In this case, the trial judge's reference to plaintiffs cause as "nonsense," combined with his other comments from the bench, show prejudgment that is unacceptable quite apart from consideration of gender.

## B.

The appearance that gender bias was present here emerges most clearly from the credibility assessment that is at the heart of this case. Much of the court's questioning of appellant and its statement of tentative decision imply a belief appellant was at fault for "allowing" Brannon's assault to occur because she placed herself at risk by agreeing to go to his house and did not more aggressively resist his advances. The following exchange, which pertains to appellant's acceptance of Brannon's invitation to come to his house to discuss the problems she was having at work, vividly expresses this point of view.

"THE COURT: Um, as I understand your testimony, even though you liked to work [Brannon's] shift, you didn't like his sexualization of the work place; is that right?

"THE WITNESS: Yes.

"THE COURT: Why did you go to his house?

"The Witness: I just—I have said previously that I had gone to him about that, and had [sic] apologized.

"The Court: But I don't understand. If you were—

"The Witness: I had forgiven him. I didn't hold a grudge. And then he told me he had a wife. I mean, all fear's [sic] flew out of my head then. To me, a wife and kids meant a complete family, um, safety, and he was just inviting me over to—

"The Court: But couldn't you have easily said, 'No, not tonight. I'm tired. I have got to go to school tomorrow. I'll talk about it later.' Why not? Why didn't you say that?

"The Witness: I—

"The Court: You don't know?

"The Witness: I didn't feel that I could.

"The Court: Okay. How about—

"The Witness: I didn't want to offend him.

"The Court: When you went back to Burger King that night, and whatever he did in there, he was doing, um, why didn't you just get in your car at that point and drive home, and say, 'I'll see you to [sic] tomorrow. I don't have time to wait around here while you do that for your wife.'

"The Witness: You were talking about the 19th? You said that night?

"The Court: The 10th. The 10th, when you went back to Burger King to get something for his wife.

"The Witness: My car wasn't there. It was at his house.

"The Court: What I'm saying is, why didn't you say, 'Sorry, Rudy. I can't go back with you. I'm too tired. I'm going now.'

"The Witness: Well, we were at the store, and then we drove back to his house.

"The Court: I understand you went to his house. What I'm saying is, before you went back to the store to get whatever he got, why didn't you just say, you know, 'It's too late. I can't wait around here any more.'

"THE WITNESS: He said he really wanted to discuss it with me that night, and that I needed to stay. I said I would listen.

"THE COURT: When his wife went to bed at 2:30 that morning, you were still concerned about school the next day, correct?

"THE WITNESS: Yes.

"THE COURT: Why didn't you leave then?

"THE WITNESS: He began—he said that he hadn't really gotten a chance to talk to me. He was going to stay up and do his paperwork.

"THE COURT: I understand that. But, you know, when do you assert yourself? Why didn't you just say, 'Hey, I don't care whether you talked to me or not, I'm tired.'

"THE WITNESS: I couldn't assert myself.

"THE COURT: You couldn't?

"THE WITNESS: No, he—he was a—he was my manager. I didn't—if he said I had to discuss something with him, I needed to. That didn't mean that I wanted to stay and have sex with him.

"THE COURT: Do you think—well, I'm not saying it meant anything. Do you think he could have fired you if you had walked out at that point?

"THE WITNESS: Yes.

"THE COURT: Okay. Why did you take a second drink when you were tired and wanted to go home?

"THE WITNESS: A second drink of juice?

"THE COURT: Whatever it was. I don't know what it was. Why did you take one if you wanted to go home? Why didn't you just say, 'No, I'm tired. I have got to go home.'

"THE WITNESS: I said I was tired; I said, 'I want to go home.' [¶] And he said, 'I'm just'—like I said, he said he wanted to talk to me about this, and he was going to be doing his paperwork, and he went and got me a drink. I mean, I didn't refuse. I just said, 'Sure.'

"THE COURT: Um, somehow he managed to hold you and take your clothes off. How did that happen; do you recall?

"THE WITNESS: Yeah.

"THE COURT: Okay. How?

"THE WITNESS: He had a steal [*sic*] grip on my arm. Um, the blouse was snapped. He took and unsnapped it. Um, he—he was scaring me with the tone of his voice, and, um, at that point he shook me. Um—

"THE COURT: Okay.

"THE WITNESS: He unsnapped my pants. He still had a steal [*sic*] grip on me, and unbuttoned his shirt.

"THE COURT: There was no time between this entire process that he didn't have his—a steal [*sic*] grip? You—

"THE WITNESS: Exactly.

"THE COURT: What about the time you testified to when he was performing oral sex on you, and had his hands on your breasts?

"THE WITNESS: His arms were very large and he—he had them very heavily on me.

"THE COURT: Okay.

"THE WITNESS: I felt I had no choice. And if I made a move, his wife would come out.

"THE COURT: I guess I understand that, that you were afraid that his wife would just add to your problems, but why didn't you tell him, 'Okay. I'm going to scream loud enough to wake up your kids.' That would sort of put him in a pickle, wouldn't it?

"THE WITNESS: I didn't think about that.

"THE COURT: Okay. Where was the phone?

"THE WITNESS: I don't know. In the kitchen, I guess. I—I didn't see a phone.

"THE COURT: You didn't see a phone in the living room?

"THE WITNESS: No.

"THE COURT: You stated at one point, and I don't know where this was, during the events of that morning, that once he had taken your clothes off, that you were constantly trying to get them on and leave. Did you ever consider just leaving without your clothes?

"THE WITNESS: No.

"THE COURT: That wouldn't be something that you would want to do?

"THE WITNESS: No.

"THE COURT: Okay. Um, another thing you mentioned, that at some point during the course of the assault upon you, that you said, 'I don't want to do this. I don't want to get pregnant.' Was pregnancy really something that crossed your mind at this point?

"THE WITNESS: Yes, it was, because he said he wanted to get into my cherry. I was trying to—

"The Court: You weren't worried about your—your physical safety at this point?

"THE WITNESS: Yes, I was worried about my physical safety. I was trying to deter him. I was trying to give him a reason not to.

"THE COURT: Okay. How long, once he inserted his penis into your mouth, was that in your mouth?

"THE WITNESS: A few minutes.

"THE COURT: After all of this happened, and you left about 6:30, did you go to class that day?

"The Witness: Well, I—I went to the dorms and slept for a few hours. And then I did, yes.

"THE COURT: After you had a chance to think about what had happened to you that morning, did you blame yourself for letting this happen?

"THE WITNESS: I didn't blame myself. I—I was angry for—um, with myself for not, um, getting out of it. That I couldn't get out of it. I—I was in a—that I was in a bind. That—a bind that humiliated me so much.

"THE COURT: So you were concerned that you weren't in control, is that right?

"THE WITNESS: In control of Rudy?

"THE COURT: Of the event.

"THE WITNESS: No, I certainly wasn't in control.

"THE COURT: Well, isn't that what you just said, you were angry with yourself for letting—putting yourself in the position where you didn't have control?

"THE WITNESS: I was angry with myself that it happened; I was angry with my body; I was angry that I even agreed to go over there.

"THE COURT: Well, I can understand that. [¶] And the reason you brought this lawsuit was to gain some control, right?

"THE WITNESS: Yes. To gain some control in my life, and not falsely.[. . .]"

The judge's statement of tentative decision still more clearly reflects the court's view that the situation appellant described was unbelievable and that she was at fault for not successfully resisting Brannon's attack. The statement declares, for example, that "[i]t is clearly inconsistent that she was offended, shocked and embarrassed by Brannon's conduct and yet chose to remain, alone, after work, with him while he completed his work. One could infer that the plaintiff sought the attention of Mr. Brannon." With respect to the alleged assault on December 11, 1987, the judge emphasized that appellant "made no resistance; she made no noise. She told Brannon she did not want to do '. . . this'; but she did nothing to stop him. She did not scream so as to alert neighbors or Mrs. Brannon." In his notice of tentative decision, the trial judge rejected out of hand "the basic scenario of an alleged sexual assault away from the work place, where the victim waits for an hour to accompany her alleged attacker, and then allows a four hour attack to occur in a residence with the attacker's family at home . . ." For this reason, the court rhetorically inquired, " 'Why was it necessary to use up the court system with a case which was, so obviously, one which could only be detrimental to everyone concerned?' Attorneys have a duty to evaluate their cases and present claims which have at least marginal merit. This case was clearly not one which should have been filed or tried. If sanctions could be imposed for this misuse of resource they would be imposed here."[7]

While we cannot say as a matter of law that appellant was entitled to judgment in her favor, the court's characterization of the case distorts the

_____

[7]Doubtless stimulated by this observation, respondents immediately moved for sanctions under section 128.5 against both appellant and her attorneys. The trial judge recused himself from hearing this motion, stating that because "I have expressed an opinion on sanctions in the Notice of Tentative Decision . . . .[] I feel it is improper for this judge to hear this motion relative to sanctions." The matter was thereafter heard by another judge, who denied the motion in its entirety.

record, which does *not* justify the irritation repeatedly expressed by the court. The implication that appellant invited Brannon's sexual attention or consented to his advances was never advanced by respondents; nor did respondents seriously dispute that the assault, which was corroborated by Officer Parris, actually took place; their chief contention was simply that it was not work related. Nor does the record suggest appellant "sought the attention of Mr. Brannon." Among other things, Dr. Berg's testimony that appellant was "passive" and usually avoided "personal interactions" was never contradicted. The emphasis the court placed on appellant's failure to "scream" at the time of the assault so as to alert Brannon's wife ignores appellant's uncontradicted testimony that Brannon had told her that if his wife woke she "wouldn't be mad at all, and wouldn't help me at all. That she—she would, in fact, like to join in. And I took that as a threat, because if she came out there, then I would have two against me. Two big people against me instead of one." Though, as we have said, many of appellant's factual claims were contested, the court appears to have been almost entirely indifferent *to evidence corroborating her fundamental contentions regarding the sexualization of her workplace, the harassment she experienced there, and the assault itself.* Among other things, the court completely brushed aside Brannon's failure on the stand to explicitly deny the assault and the sexual harassment attributed to him and others by appellant.[8] In short, the court's treatment of the evidence does not appear to have been even-handed.[9]

As in *Iverson,* the judgment seems to have improperly turned on stereotypes about women rather than a realistic evaluation of the facts (*In re*

---

[8]Virtually the only factual assertion Brannon denied was that appellant came to his house the night of December 11, 1987. Brannon claimed appellant "has never been to my home except for November 19th, 1987."

[9]The court's personal interest in the case is also shown by the improper manner in which it obtained evidence. During his interrogation of appellant, the judge inquired about weather conditions on November 19, 1987, the day she claimed she first visited Brannon's home, and December 10th of that year, the day she returned from Thanksgiving vacation, which was also the day before Brannon's assault. The following colloquy ensued:

"THE WITNESS: Um, I don't remember it raining hard like it had. It wasn't raining.

"THE COURT: Wasn't raining on the 10th?

"THE WITNESS: If it was raining, it was just misting, because the 19th had just been cats and dogs raining."

Later that day the court unexpectedly took judicial notice of the rainfall on the days in question. In its Statement of Decision the court observed that "U.S. Weather Bureau records show no rain on the night of November 19, 1987," and used the putative discrepancy between this fact and appellant's testimony as a reason to question her overall credibility. The court should not have resorted to information never offered in open court without affording the parties a reasonable opportunity to meet such information before judicial notice is taken. (Evid. Code, § 455, subd. (b).) One of the corollaries of canon 3 of the Code of Judicial Conduct ("A Judge Should Perform the Duties of Judicial Office Impartially and Diligently") is that "[a] judge must not independently investigate facts in a case and must consider only the evidence presented, unless otherwise authorized by law." (Cal. Code Jud. Conduct,

*Marriage of Iverson, supra,* 11 Cal.App.4th at p. 1499), a problem apparently all too common in sexual harassment cases.[10] The court's disparagement of appellant's credibility on the grounds that she accepted Brannon's invitation to come to his house, remained alone with him, and did not resist his assault more forcibly is based on an unrealistic and gender-biased standard of reasonableness. Among other things, the court appears oblivious to appellant's dependence on her assailant for her job and scholarship and the need to placate him for those reasons. The court was equally indifferent to the intimidation a woman in appellant's position would likely experience. As stated in *Ellison* v. *Brady* (9th Cir. 1991) 924 F.2d 872, "[m]en, who are rarely victims of sexual assault, may view sexual conduct in a vacuum without a full appreciation of the social setting or the underlying threat of violence that a woman may perceive." (*Id.* at p. 879.) The immobilizing fear a physically powerful and sexually driven man may understandably inspire in a woman and the possibility resistance might exacerbate the danger may not be obvious to some men, but it cannot fairly be ignored by the trier of fact in a sexual harassment case.

■ Because it is so unrealistic, the traditional view that a woman who "fails" to aggressively resist an alleged sexual assault may therefore have consented was authoritatively repudiated in this state many years ago. Prior to 1980, our Penal Code defined rape as an act of sexual intercourse under circumstances where the victim resists, but where "resistance is overcome by force or violence" or where "a person is prevented from resisting by threats of great and immediate bodily harm, accompanied by apparent power of execution . . . ." (Former Pen. Code, § 261, subds. (2), (3).) The resistance requirement was removed from the definition of rape in 1980. Two years later the Legislature added section 261.6 to the Penal Code to make it clear that the failure to resist also could not be used to show consent to other forms of sexual assault.[11]

In *People* v. *Barnes* (1986) 42 Cal.3d 284 [228 Cal.Rptr. 228, 721 P.2d 110] our Supreme Court explained that the traditional requirement that a

commentary to canon 3B(7).) The factual inquiry independently undertaken by the court in this case without notice is uncharacteristic of an impartial judge.

[10]The Ninth Circuit Gender Bias Task Force reviewed the published reports on gender bias from 23 other jurisdictions and found that "twenty-one of those reports discuss—as part of considerations of issues such as domestic violence, sexual assault, and courtroom interaction —the difficulties women face when seeking to establish their credibility." (Rep. of the Ninth Circuit Gender Bias Task Force, *supra,* 67 So.Cal.L.Rev. at p. 866, fn. 11; see also Draft Rep. of the Judicial Council, *supra,* at p. 6.)

[11]Penal Code section 261.6 provides, inter alia, that "In prosecutions under Section 261 [rape], 262 [spousal rape], 286 [sodomy], 288a [oral copulation], or 289 [penetration by a foreign object], in which consent is at issue, 'consent' shall be defined to mean *positive cooperation* in act or attitude pursuant to an exercise of free will. The person must act freely and voluntarily and have knowledge of the nature of the act or transaction involved." (Italics added.)

woman resist her attacker was "grounded in the basic distrust with which courts and commentators traditionally viewed a woman's testimony regarding sexual assault." (*Id.* at p. 298, citing Schwartz, *An Argument For the Elimination of the Resistance Requirement from the Definition of Forcible Rape* (1983) 16 Loy. L.A. L.Rev. 567, 569-570; LeGrand, *Rape and Rape Laws: Sexism in Society and Law* (1973) 61 Cal.L.Rev. 919, 931.) "Such wariness of the complainant's credibility created 'an exaggerated insistence on evidence of resistance.' [Citation.] As an objective indicator of nonconsent, the requirement of resistance insured against wrongful conviction based solely on testimony the law considered to be inherently suspect. In our state, it supplied a type of intrinsic corroboration of the prosecuting witness's testimony, a collateral demanded even when extrinsic corroboration was not required. Thus did the resistance requirement continue even in its modified form, to nurture and reflect the perspective, still held by some modern commentators, that 'human nature will impel an unwilling woman to resist unlawful sexual intercourse with great effort.' [Citation.]" (*People* v. *Barnes*, *supra*, 42 Cal.3d at p. 299.)

Rejecting "the traditional notion that a woman who does not resist has consented" (*People* v. *Barnes*, *supra*, 42 Cal.3d at p. 299), the court in *Barnes* described the empirical evidence justifying elimination of the resistance requirement. For example, the court described a representative study finding that "many women demonstrate 'psychological infantilism'—a frozen fright response—in the face of sexual assault . . . [which] resembles cooperative behavior." (*Ibid.*) ". . . . [T]he 'victim may smile, even initiate acts, and may appear relaxed and calm.' [Citation.] Subjectively, however, she may be in a state of terror." (*Ibid.*) The studies thus "suggest that lack of physical resistance may reflect a 'profound primal terror' rather than consent. [Citations.]" (*Id.* at pp. 299-300.)[12] The Supreme Court also pointed out that ". . . a growing body of authority holds that to resist in the face of sexual assault is to risk further injury." (*Id.* at p. 300, citing Note, *Elimination of the Resistance Requirement and Other Rape Law Reforms: The New York Experience* (1983) 47 Alb. L. Rev. 871 and U.S. Dept. of Justice, Forcible Rape: A National Survey of the Response of Prosecutors (1977) pp. 14-15 [reporting that the likelihood of receiving injuries requiring medical treatment nearly doubled when victims resisted assailants]; Note, *Recent Statutory Developments in the Definition of Forcible Rape* (1975) 61 Va. L.Rev. 1500, 1506; and Amir, Patterns in Forcible Rape, *supra*, at pp. 164-165; Com., *Towards a Consent Standard in the Law of Rape* (1976) 43 U.Chi.L.Rev. 613, 626-627.)

---

[12]The studies the Supreme Court primarily relied upon are Symonds, *The Rape Victim: Psychological Patterns of Response* (1976) 36 Am. J. Psychoanalysis 27; Queen's Bench Foundation, Rape Prevention and Resistance (1976); Amir, Patterns in Forcible Rape (1971).

The manner in which " 'rules and prejudices . . . borrowed from traditional rape law' have been imported and used as 'tools in sexual harassment cases' against women plaintiffs" was noted by the Ninth Circuit Gender Bias Task Force. (Rep. of the Ninth Circuit Gender Bias Task Force, *supra*, at p. 126, fn. 11, citing Estrich, *Sex at Work* (1991) 43 Stan.L.Rev. 813, 815.) Elimination of the resistance requirement in our criminal law represents what the people of this state believe is reasonable to expect of a victim of a sexual assault. There is no justification for applying a different standard of reasonableness in a civil case such as this. Indeed, the need for a realistic standard of what constitutes reasonable conduct on the part of a victim of an alleged sexual assault or harassment may be greater in the civil context, "where the very purpose of the law is to protect women, and where the deprivation of liberty and the stigma inherent in criminal punishment are absent" (Estrich, *Sex at Work*, *supra* 43 Stan.L.Rev. at p. 841) and, accordingly, a lower standard of proof applies.

## VI.

■■■ Having examined the trial judge's statements and conduct as a whole, we are drawn ineluctably to the conclusion that his "conduct indicated an 'unsympathetic attitude toward the litigation' that did 'not accord with recognized principles of judicial decorum consistent with the presentation of a case in an atmosphere of fairness and impartiality[]' . . . ." (*In re Marriage of Iverson*, *supra*, 11 Cal.App.4th at p. 1501, quoting *Pratt* v. *Pratt*, *supra*, 141 Cal. at p. 252.) The court's remarks throughout trial show that its conception of the circumstances that may constitute sexual harassment were based on stereotyped thinking about the nature and roles of women and myths and misconceptions about the economic and social realities of women's lives. The average person on the street might therefore justifiably doubt whether the trial in this case was impartial. (*In re Marriage of Iverson*, *supra*, 11 Cal.App.4th at p. 1505 (conc. opn. of Moore, J.).) Accordingly, the judgment cannot stand.

The judgment is reversed and the matter remanded for a new trial on all issues. The Presiding Judge of the Humboldt County Superior Court is directed to assign the matter to a different judge. (§§ 170.1, subd. (c); 187.)

Smith, J., and Phelan, J., concurred.

Respondents' petition for review by the Supreme Court was denied September 14, 1995.