Filed 9/19/24  G.W. v. Coronado Unified School District CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| G.W., a Minor, etc., et al.,<br><br>    Plaintiffs and Appellants,<br><br>    v.<br><br>CORONADO UNIFIED SCHOOL DISTRICT et al.,<br><br>    Defendants and Respondents. | D082619<br><br><br>(Super. Ct. No. 37-2022-00034756-CU-NP-CTL) |

APPEAL from an order of the Superior Court of San Diego County, Gregory W. Pollack, Judge.  Affirmed.

Law Offices of Tracy L. Henderson, Tracy L. Henderson; The Gavel Project, and Ryan Heath for Plaintiffs and Appellants.

 Winet Patrick Gayer Creighton & Hanes, Randall L. Winet, and Erin N. Taylor for Defendants and Respondents.

G.W., a minor, and her mother Nicole W. (plaintiffs) sued the Coronado Unified School District (District) and 20 individual defendants, including members of the District's Board of Trustees (Trustees), District and school administrators (administrators), and several Coronado High School (CHS) teachers (Teachers) (collectively, defendants).  Plaintiffs alleged that

defendants' adoption and enforcement of a mask policy at CHS to prevent the spread of COVID-19 during the pandemic violated G.W.'s constitutional rights and were tortious. The District, Trustees, administrators, and Teachers filed motions to strike plaintiffs' complaint as a strategic lawsuit against public participation (SLAPP) under Code of Civil Procedure[1] section 425.16. In a single order, the trial court granted all four anti-SLAPP motions (one for each group of defendants), ruling that: (1) plaintiffs' suit arose from defendants' protected activity, and (2) plaintiffs failed to demonstrate a probability of prevailing on their claims.

Plaintiffs contend on appeal that the court erred because: (1) their claims did not arise from activity protected by the anti-SLAPP statute; (2) defendants' enforcement of the mask policy was "illegal as a matter of constitutional law"; and (3) the court should not have taken judicial notice of COVID-19's "asymptomatic transmission." Plaintiffs further contend that the trial court judge, the Honorable Gregory W. Pollack, should be disqualified for demonstrating bias.

We conclude that plaintiffs have forfeited their claims of error by failing to include a factual summary of the significant facts in their opening brief and failing to address the multiple legal grounds for the trial court's ruling on the merits of their claims. We also reject plaintiffs' arguments on the merits and conclude they have failed to demonstrate a probability of prevailing on their constitutional and other claims. Accordingly, we affirm the trial court's order.[2]

---

[1]     Further undesignated statutory references are to the Code of Civil Procedure.

[2]     Plaintiffs' request for judicial notice filed September 4, 2024 (one week before oral argument) is denied as untimely and irrelevant, and also because

FACTUAL AND PROCEDURAL BACKGROUND

*A.  G.W.'s Non-Compliance with CHS's Mask Policy*

In March 2020, California Governor Gavin Newsom declared a state of emergency in response to the COVID-19 pandemic.  Public high schools across the state, including CHS, closed their campuses and provided remote instruction for the remainder of 2020.  CHS returned to in-person learning for the 2020 to 2021 school year under a reopening plan based on state mandates and public health directives.  Assistant superintendent Donnie Salamanca was involved in developing the reopening plan, which included a requirement that all CHS staff and students wear masks indoors while at the school site, with limited exemptions, in accordance with state and California Department of Public Health directives at the time.  Reopening procedures were to be updated "as necessary" based on COVID-19 transmission and case rates.

The District's mask policy continued into the 2021–2022 school year.  In August 2021, superintendent Karl Mueller disseminated a statement through a District newsletter explaining that the District would comply with and enforce the mask policy.  A local news outlet reported that according to Salamanca, defying the masking order could expose the District and the Trustees to liability.  State agency guidance explained that masks were a low-cost, minimally intrusive way to mitigate the spread of COVID-19 within schools and the broader community.  During the 2021 to 2022 school year, students had the option of either attending classes in person or virtually.

In January 2022, G.W. started attending classes at CHS in person without a mask, intending to protest the District's mask policy.  The

---

plaintiffs failed to request judicial notice of the November 2020 article in the trial court.

3

Teachers and three administrators, Niamh Foley, the District's director of student services, Karin Mellina, the CHS principal, and Shane Bavis, a CHS assistant principal, requested that G.W. abide by the policy, but she refused. When it became clear she would not wear a mask, Bavis called Nicole and asked her to bring G.W. home, but Nicole refused. Nicole and G.W. also refused to enroll in remote classes, asserting that G.W. was constitutionally entitled to an in-person education without having to wear a mask.

Over the several weeks that followed, G.W. continued to come to school in person without a mask. The Teachers, Mellina, Foley, and Bavis facilitated G.W.'s participation in classes from just outside the classroom doors or remotely from other locations on campus. G.W. insisted, however, that she should be allowed to attend in person and repeatedly attempted to enter classrooms without a mask. On many of those occasions, teachers had to move all the other students in the classroom to another classroom, or hold class outdoors, to comply with safety policies. Plaintiffs allege that when G.W. participated in classes from outside, she was subjected to "miserable cold" on days where the regional highs were in the low to mid-60s, "scorching heat," and "exposure to the elements." Plaintiffs also allege that while G.W. was outside, she could not participate in an emergency lockdown drill with her peers. Bavis allegedly instructed G.W. to lockdown in a nearby bathroom, which plaintiffs claim was unsafe because it had no interior lock to protect her against an emergency such as an active shooter.

As a result of her non-compliance, G.W. was suspended twice in February 2022 for willfully defying school policy, disrupting school activities, and defying the direction of school staff and administration. On February 1, about two weeks before G.W. was first suspended, Salamanca e-mailed Nicole to explain that the District was required by state law to enforce the mask

4

mandate and that G.W.'s failure to comply was causing her exclusion from classrooms. He wrote that the school would continue to offer G.W. independent study options as an alternative. The e-mail also stated that G.W.'s absences from the classroom were unexcused, could negatively impact her academic standing and her inter-district transfer agreement, and could result in "potential discipline."

After G.W. continued to come to school without a mask, Salamanca e-mailed Nicole again on February 7, 2022, informing her that beginning the next day, G.W. would no longer be allowed to attend classes remotely from on campus and would have to either wear a mask, obtain an exemption, or enroll in independent study. Salamanca also offered G.W. the short-term option of participating in classes remotely from off-campus along with students who are in temporary quarantine. He warned, however, that if G.W. continued her non-compliance, she might "be subject to disciplinary action" for her behavior in accordance with "the district's Discipline Action Guide[.]"[3] After Nicole turned down Salamanca's proposed alternatives, Salamanca wrote back that same day to inform Nicole that the school had consulted with its legal counsel. He stated that because Nicole had failed to submit a policy exemption request as she previously indicated she would, G.W. would be marked unexcused if she showed up to school the next day without a mask, and the school would "proceed with disciplinary action."

G.W. came to school for several days afterwards without a mask. During that time, she was barred from entering her classrooms and marked with unexcused absences.

On February 16, 2022, G.W. again attempted to enter one of her classrooms without a mask. But this time she refused to leave when asked,

---

[3] This guide is not included in the record before us.

so Bavis came to the classroom and requested that she put on a mask. After the students in that class were moved to another room, G.W. attempted to follow them and again refused to leave when asked. Bavis warned G.W. that if she continued to refuse to comply, she could be suspended. When G.W. entered yet another classroom without a mask, Mellina exercised her discretion as principal to suspend G.W. for one day. Mellina agreed to allow G.W. access to campus during that suspension and attend classes remotely.

When G.W. attempted to enter classrooms without a mask on February 23, 2022, Mellina suspended G.W. again. This time, G.W. was prohibited from being on campus for the duration of her suspension—but G.W. still returned the next day and attempted to enter one of her classrooms. Plaintiffs allege that Mellina physically blocked her from entering the classroom and threatened to report G.W. for assault. A school resource officer then told G.W. and Nicole, who was also present, to go home and return the following day to attend classes remotely.

G.W. continued to refuse to wear a mask for two weeks after her second suspension ended. During that time, she participated in classes virtually from outdoor locations on campus, or by sitting outside of the classroom door. Mellina, Foley, Bavis, and various Teachers continued telling plaintiffs that G.W. had to adhere to the mask mandate, and they also continued to prevent her from entering classrooms.

On March 11, 2022, G.W. disenrolled from CHS. Around that time, the District lifted its indoor mask requirement in accordance with updated health guidance from the Governor's office.

*B. The Complaint*

Plaintiffs sued defendants under title 42 United States Code section 1983 alleging violations of G.W.'s rights to freedom of speech and expression

under the First and Fourteenth Amendments to the United States Constitution, article I, section 2(a) of the California Constitution, and Education Code section 48907, subdivision (a). Plaintiffs also alleged violations of the Bane Act (Civ. Code, § 52.1) and tort claims for negligence and intentional infliction of emotional distress (IIED). The complaint alleged that the mask policy was illegal and that defendants "intentionally isolated and belittled G.W. by excluding her from the educational process," caused G.W. harm by forcing her to sit outside in the "miserable cold," penalized G.W. academically, and caused both plaintiffs severe trauma, anxiety, and stress. Plaintiffs sought declaratory relief, damages, civil penalties, attorney's fees, punitive damages, and costs.

Each of the four groups of defendants filed an anti-SLAPP motion, arguing that plaintiffs' complaint arose from protected activity under section 425.16, subdivisions (e)(1) through (e)(4). Defendants also argued that plaintiffs could not demonstrate a probability of prevailing because: (1) defendants are immune from liability under various state statutes, the Eleventh Amendment to the United States Constitution, and the qualified immunity doctrine; (2) requiring that students wear a mask consistent with public health orders does not violate constitutional rights; (3) there is no evidence any of defendants engaged in threats of violence, intimidation, or coercion; and (4) no evidence supports plaintiffs' claims for negligence or intentional infliction of emotional distress. Each of the four motions was supported by an identical set of 45 exhibits plus declarations of each of the 20 individual defendants.

Plaintiffs opposed the anti-SLAPP motions, contending that defendants' conduct in enforcing the mask policy did not constitute protected activity and was also illegal as a matter of law. They also argued that

7

defendants are not immunized from liability and there is sufficient evidence that, if credited, would demonstrate a probability of prevailing on the merits. In opposition to the anti-SLAPP motions, plaintiffs submitted an 11-page declaration of G.W. with three exhibits and a six-page declaration of her mother with seven exhibits.

### C. Motion Hearing and Ruling

Judge Pollack presided over the hearing on defendants' anti-SLAPP motions. During arguments, plaintiffs' counsel asserted that the case was "not about a mask policy," but rather about "the punitive implementation" of the policy. Judge Pollack asked how a mask policy implemented for safety reasons would be different from a rule prohibiting firearms, and he commented that "[g]uns kill and so does COVID." Plaintiffs' counsel asserted that COVID-19's dangerousness and transmissibility were irrelevant, but also argued that medical testimony would be required before the court could make findings on those topics. Judge Pollack stated more than once that he would take judicial notice of the fact that COVID-19 can be transmitted by an asymptomatic carrier, which plaintiffs' counsel disputed. Judge Pollack also expressed concern that G.W. was being used as a "political pawn," and he voiced skepticism of some allegations in the complaint.

In a single written order issued after the hearing, the trial court granted each of defendants' anti-SLAPP motions. The court first found that the mask policy at CHS was legal as a matter of law, and that defendants were "entitled to undertake all reasonable efforts to enforce" the policy. The court noted that G.W.'s conduct was "clearly disruptive of the orderly operation of the school[,]" and that the school took efforts to accommodate G.W. before resorting to suspension. The court further found that the promulgation and enforcement of mask policies are "public issues of great

8

public interest," and that the anti-SLAPP statute protects defendants' comments and actions.

As to plaintiffs' probability of prevailing on the merits, the court ruled that several immunities barred plaintiffs' claims, specifically under Education Code section 44805, Government Code sections 818.2, 820.2, 820.4, and 855.4, Civil Code section 47, subdivision (a), and the Eleventh Amendment to the United States Constitution. The court also found that plaintiffs had not met their burden of establishing a probability of prevailing on their Bane Act or IIED claims because defendants' conduct "was quite appropriate" and "reasonable" as a matter of law. The court did not separately address the merits of G.W.'s negligence claim.

On these grounds, the court granted each of defendants' four anti-SLAPP motions.

DISCUSSION

I

A. *Statutory Framework*

The anti-SLAPP statute provides in relevant part that "[a] cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech . . . in connection with a public issue shall be subject to a special motion to strike [anti-SLAPP motion], unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." (§ 425.16, subd. (b)(1).) Ruling on an anti-SLAPP motion typically involves two steps. First, defendants moving to strike a cause of action must show the act underlying the claim falls within one of the four categories of protected activity listed in section 425.16, subdivision (e). (*Baral v. Schnitt* (2016) 1 Cal.5th 376, 396

9

(*Baral*); *Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 66; *Bowen v. Lin* (2022) 80 Cal.App.5th 155, 160 (*Bowen*).)

Those four categories include: "(1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law, (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law, (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest, or (4) any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest."  (§ 425.16, subd. (e)(1)–(4).)

If defendants make a sufficient showing under the first prong of the anti-SLAPP analysis, the burden shifts to plaintiffs to show the targeted causes of action are legally sufficient and supported by evidence that, if credited, would sustain a judgment for plaintiffs.  (*Baral, supra*, 1 Cal.5th at pp. 384, 396; *Bowen, supra*, 80 Cal.App.5th at p. 160.)  "Only a cause of action that satisfies *both* prongs of the anti-SLAPP statute—i.e., that arises from protected speech or petitioning *and* lacks even minimal merit—is a SLAPP, subject to being stricken under the statute."  (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 89; accord, *Bowen*, at p. 160.)  The trial court's decision on both prongs is subject to de novo review on appeal.  (*Geiser v. Kuhns* (2022) 13 Cal.5th 1238, 1250; *Monster Energy Co. v. Schechter* (2019) 7 Cal.5th 781, 796; *Starr v. Ashbrook* (2023) 87 Cal.App.5th 999, 1018.)

B. *Forfeiture*

An appellant's opening brief must include a summary of the significant facts with appropriate citations to the record. (Cal. Rules of Court, rule 8.204(a)(1)(C), (a)(2)(C).) The facts significant to this anti-SLAPP appeal are based on: (1) the allegations of the 315-paragraph complaint, (2) the 45 exhibits and 20 declarations submitted by defendants in support of their anti-SLAPP motions, and (3) the two declarations with 10 attached exhibits submitted by plaintiffs in opposition.

Plaintiffs' opening brief contains no factual summary of the allegations of their own complaint and no mention of the evidence submitted by both sides in connection with the anti-SLAPP motions. The opening brief never even identifies the 20 individually named defendants or describes what role each played in the masking dispute or what the factual basis for liability is against each of them. We cannot assess whether the claims against each of these defendants arise from protected activity without a proper factual summary of the allegations against them, including the statements each is alleged to have made regarding the mask mandate. Nor can we assess whether plaintiffs have demonstrated a sufficient probability of prevailing without a proper summary of the evidence submitted by both sides.

Even on de novo review, we are not "obligate[d] . . . to cull the record for the benefit of the appellant . . . ." (*Bains v. Moores* (2009) 172 Cal.App.4th 445, 455; see also *People v. ex rel. Reisig v. Acuna* (2010) 182 Cal.App.4th 866, 879 ["It is not the function of this court to comb the record looking for evidence or the absence of evidence to support [appellants'] argument."].) We conclude that plaintiffs have forfeited their claims of error because their opening brief does not comply with the factual summary requirement of California Rules of Court, rule 8.204. (*Perry v. Kia Motors America, Inc.*

(2023) 91 Cal.App.5th 1088, 1096; *Singh v. Lipworth* (2014) 227 Cal.App.4th 813, 817.)

    C. *Prong One*

       Notwithstanding the forfeiture, we will briefly address the two arguments plaintiffs make on prong one. First, plaintiffs contend that the trial court mischaracterized their claims by finding they were challenging the lawfulness of the District's mask policy itself, rather than its "punitive" implementation or enforcement. Plaintiffs now concede that the adoption of the mask policy is "undisputably" protected activity but deny that their complaint challenges the validity of the policy.

       Plaintiffs misstate the allegations of their own complaint. The complaint clearly alleges that "[f]rom February 2, 2021, until lifting the policy on March 14, 2022, Defendants collectively chose to adopt and maintain an illegal indoor mask mandate for all students within CUSD's jurisdiction." It further alleges that the mask mandate was "illegal" because it was based on "non-binding" guidance from the California Department of Public Health. Plaintiffs named as defendants the individual members of the school board who they allege adopted the masking policy, and the complaint does not allege that they participated in CHS's enforcement of the policy. The complaint also attaches and incorporates by reference an "ULTIMATUM RE: YOUR SCHOOL'S COVID-19 POLICIES" that G.W. provided to the school. This document referred to "your institution's unconstitutional COVID-19 policies" including "masking, testing, and vaccination policies." It also threatened suit against "all involved in the adoption or enforcement of such policies." Finally, in the prayer for relief, plaintiffs' complaint explicitly sought "a judicial declaration that school district policy relating to forced masking is invalid and unenforceable . . . ."

These allegations make abundantly clear that plaintiffs are in fact challenging the adoption and validity of the masking policy itself. For purposes of an anti-SLAPP motion, the court must "assume [the] complaint means what it says." (*Bonni v. St. Joseph Health System* (2021) 11 Cal.5th 995, 1017.) Plaintiffs cannot prevail on appeal merely by denying a central theory pled in their complaint.

In their opening brief, plaintiffs make no effort to differentiate between the allegations of their complaint challenging the masking policy itself and those challenging its enforcement or implementation. Nor do they distinguish between those individual defendants responsible for adopting the policy and those responsible for enforcing it. They also do not discuss which defendants allegedly made public statements about the mask policy (such as the statements to the press quoted in the complaint) and which allegedly engaged in "punitive" conduct enforcing the policy. Without a properly developed argument and factual summary of the allegations made against each defendant in the opening brief, " '[w]e are not bound to develop appellants' arguments for them.' " (*Cahill v. San Diego Gas & Electric Co.* (2011) 194 Cal.App.4th 939, 956.) Even applying a de novo standard of review, our review is limited to issues which have been adequately raised and supported in the opening brief. (*Golden Door Properties, LLC v. County of San Diego* (2020) 50 Cal.App.5th 467, 554–555.) Confining ourselves to the issues raised in the opening brief, we reject plaintiffs' contention that their complaint did not challenge the adoption of the masking policy, which they concede is protected activity.

We also reject the only other argument plaintiffs make on prong one: that the anti-SLAPP statute is inapplicable because the mask policy was illegal as a matter of law for infringing on G.W.'s First Amendment rights.

13

Where an anti-SLAPP motion concerns alleged protected activity that "the defendant concedes, or the evidence conclusively establishes . . . was illegal as a matter of law, the defendant is precluded from using the anti-SLAPP statute to strike the plaintiff's action." (*Mendoza v. ADP Screening & Selection Services, Inc.* (2010) 182 Cal.App.4th 1644, 1654 (*Mendoza*), italics omitted.)

Defendants have not conceded, nor has the evidence conclusively shown, that the mask policy was illegal as a matter of law. First, courts have found that the illegality exception narrowly applies only to criminal conduct. (See *Dziubla v. Piazza* (2020) 59 Cal.App.5th 140, 151 (*Dziubla*); *Mendoza, supra*, 182 Cal.App.4th at p. 1654.) Second, "it is not sufficient that plaintiffs can reasonably argue or offer some evidence that defendant's conduct was unlawful." (*Dziubla*, at p. 151, italics omitted.) As we discuss below under the second prong of the anti-SLAPP analysis, the evidence is far from conclusive that the mask policy violated plaintiffs' constitutional rights. We therefore find that the illegality exception to the anti-SLAPP statute does not apply.

D. *Probability of Prevailing*

Under the second prong, the burden shifts to plaintiffs to establish a probability of prevailing on their claims against defendants for their protected activities. As we shall explain, we conclude that plaintiffs have forfeited their arguments as to this prong as well, but to the extent they have preserved an argument that their constitutional claims have minimal merit, we disagree.

Plaintiffs' only prong-two argument on appeal is that the trial court erroneously took judicial notice of COVID-19's asymptomatic transmission. This position is puzzling because plaintiffs' counsel herself asserted that

14

COVID-19's transmission was "irrelevant" to their theory of the case.  But more importantly, plaintiffs have failed to contest any of the substantive grounds for the trial court's prong-two ruling having nothing to do with asymptomatic transmission.  The court ruled that several immunities barred plaintiffs' claims, specifically under Education Code section 44805; Government Code sections 818.2, 820.2, 820.4, 855.4; Civil Code section 47, subdivision (a); and the Eleventh Amendment to the United States Constitution.  The court also found that plaintiffs had not met their burden of establishing a probability of prevailing on their Bane Act or IIED claims because defendants' conduct "was quite appropriate" and "reasonable" as a matter of law.  Plaintiffs addressed none of these prong two rulings in their opening brief.  Although the court did not expressly address the merits of G.W.'s negligence claim, it is plaintiffs' burden to show their claim has minimal merit, and they have put forth no argument on appeal to meet that burden.  Accordingly, we conclude plaintiffs forfeited any challenge on appeal to the court's finding that they failed to establish a probability of prevailing under prong two.[4]  (*Keyes v. Bowen* (2010) 189 Cal.App.4th 647, 655–656.)

---

[4]    We also disagree that the trial court erred by taking judicial notice of COVID-19's asymptomatic transmission.  Courts may take judicial notice of established scientific facts, even those that may be controversial to some in the general public.  (Evid. Code, § 452, subd. (h); *Brown v. Smith* (2018) 24 Cal.App.5th 1135, 1142–1143 [taking judicial notice of safety and effectiveness of vaccines].)  As other California courts have acknowledged, "it is undisputed that the disease [COVID-19] spreads through airborne transmission from an infected person (who may be asymptomatic) to an infected member of the community . . . ."  (*County of Los Angeles Dept. of Public Health v. Superior Court* (2021) 61 Cal.App.5th 478, 482 (*County of Los Angeles*); see also *Western Growers Assn v. Occupational Safety & Health Standards Bd.* (2021) 73 Cal.App.5th 916, 938 [discussing November 2020 Cal/OSHA findings of emergency which "discussed the specific challenge posed by COVID-19 because infected individuals may be asymptomatic, yet

15

Plaintiffs did argue under prong one that the mask policy was illegal as a matter of law because it violated G.W.'s constitutional right to free speech. Specifically, plaintiffs claim G.W.'s refusal to wear a mask was an expressive act of protest protected by the First Amendment. To the extent those arguments can be construed as contending that their constitutional claims have minimal merit under prong two, we disagree.

The First Amendment guarantees that "Congress shall make no law . . . abridging the freedom of speech[.]" (U.S. Const., 1st Amend.) Article I, section 2(a) of the California Constitution similarly provides that "[e]very person may freely speak" and laws "may not restrain or abridge liberty of speech[.]" These provisions afford protection to symbolic or expressive conduct as well as actual speech. (*People v. Peterson* (2023) 95 Cal.App.5th 1061, 1068.)

We reject plaintiffs' argument that enforcement of the mask mandate constituted compelled speech or violated G.W.'s rights by preventing her from attending school unmasked as a form of protest. As the Eleventh Circuit has explained, "wearing a mask is not speech or expressive conduct protected by the First Amendment." (*Zinman v. Nova Southeastern University, Inc.* (11th Cir., Mar. 29, 2023, No. 21-13476) 2023 WL 2669904, *5 (*Zinman*) [rejecting student's challenge to mask mandate adopted during COVID-19 pandemic].) For expressive conduct, "the likelihood must be great that 'the message would

_____

able to transmit the disease to others"]; *See's Candies, Inc. v. Superior Court* (2021) 73 Cal.App.5th 66, 85 [stating "[i]t is well known that people may transmit viruses, including the virus that causes COVID-19, before they themselves have developed symptoms" and citing guidance of Centers for Disease Control and Prevention "noting that persons afflicted with 'asymptomatic' or 'pre-symptomatic' COVID-19 can transmit the virus to others"]; *Midway Venture LLC v. County of San Diego* (2021) 60 Cal.App.5th 58, 66 ["The virus can be transmitted even by individuals who do not show symptoms."].)

16

be understood by those who viewed it.' " (*Ibid.*, quoting *Tex. v. Johnson* (1989) 491 U.S. 397, 404.)  But there are "many more probable explanations for a person's decision to go unmasked that have nothing to do with conveying any sort of message -- political, religious, or otherwise.  Thus, for example, a person may not be masked for medical reasons, or because he left his mask at home, or perhaps just on account of a personal dislike for masking." (*Zinman*, at p. *5.)

Enforcement of such a school mask requirement does not constitute compelled speech either.  In the context of the COVID-19 pandemic, a mask mandate does not constitute compelled speech because wearing a mask would not reasonably be understood as conveying any message.  (*Antietam Battlefield KOA v. Hogan* (D. Md. 2020) 461 F.Supp.3d 214, 236–237 (*Antietam Battlefield*).)  "Instead, especially in the context of COVID-19, wearing a face covering would be viewed as a means of preventing the spread of COVID-19, not as expressing any message." (*Id.* at p. 237; see also *Jacobs v. Clark County School Dist.* (9th Cir. 2008) 526 F.3d 419, 437–438 [school uniform requirement did not constitute compelled speech].)  The remote possibility that someone might view wearing a mask during the COVID-19 pandemic as a message is not enough to confer First Amendment protection.  "It is possible to find some kernel of expression in almost every activity a person undertakes—for example, walking down the street or meeting one's friends at a shopping mall—but such a kernel is not sufficient to bring the activity within the protection of the First Amendment." (*Dallas v. Stanglin* (1989) 490 U.S. 19, 25.)

Nor did G.W. have a constitutional right to protest the mask mandate by violating it.  As another court has explained in rejecting the same argument: "[S]imply framing defiance of a law or regulation as a means of

17

communicating disagreement with that law or regulation cannot alone trigger a First Amendment analysis. . . .  [¶] . . . [¶]  The same might be said of, say, refusing to wear a seatbelt or a motorcycle helmet, despite laws requiring such safety measures, in protest of being told to do so." (*Zinman v. Nova Southeastern University, Inc.* (S.D. Fla., Aug. 30, 2021, No. 21-CV-60723) 2021 WL 4025722, at \*13, report and recommendation adopted in *Zinman v. Nova Southeastern University* (S.D. Fla., Sept. 15, 2021, No. 21-CIV-60723-RAR) 2021 WL 4226028, affd. *Zinman, supra,* 2023 WL 2669904.) As the trial court observed: "The fundamental flaw in plaintiffs' case is the assumption that a student can violate any school rule so long as it is done for protest reasons.  This logic would allow a student to attend school totally nude so long as the student's nudity was to protest the sexually-repressive Puritan norms of our society being advanced by the school."  G.W. has made no effort to refute this reasoning—and we agree with it.

Even if G.W.'s refusal to wear a mask were expressive conduct, however, we would still find no violation.  Constitutional rights "may at times, under the pressure of great dangers" be restricted "as the safety of the general public may demand." (*Jacobson v. Massachusetts* (1905) 197 U.S. 11, 29 (*Jacobson*).)  *Jacobson* established the longstanding precedent of an "extremely deferential standard of review applicable to emergency exercises of governmental authority during a public health emergency." (*County of Los Angeles, supra*, 61 Cal.App.5th at pp. 487–488.)  And when reviewing the constitutionality of public health mandates, "courts should be extremely deferential to public health authorities, particularly during a pandemic, and particularly where . . . the public health authorities have demonstrated a rational basis for their actions.  Wisdom and precedent dictate that elected officials and their expert public health officers, rather than the judiciary,

18

generally should decide how best to respond to health emergencies in cases not involving core constitutional freedoms." (*Id.* at p. 483.)

Furthermore, in the school context, the United States Supreme Court has explained that student-speech claims must be evaluated "in light of the special characteristics of the school environment." (*Tinker v. Des Moines Indep. Cmty. Sch. Dist.* (1969) 393 U.S. 503, 506 (*Tinker*).) Those characteristics include "the comprehensive authority of the States and of school officials, consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools." (*Id.* at p. 507.) Considering the need to set standards for student conduct, the Court held that restrictions on student speech are constitutionally justified if school officials can show that the speech in question "would materially and substantially disrupt the work and discipline of the school" or invade the rights of others. (*Id.* at p. 513.)

Few California state courts have addressed the constitutionality of COVID-19 health mandates outside of the Sixth Amendment context involving the rights to public trial, speedy trial, and confrontation. But we find one court's analysis of a health agency's temporary prohibition of outdoor dining helpful here. In *County of Los Angeles*, the Court of Appeal observed "it is undisputed that [COVID-19] spreads through airborne transmission from an infected person (who may be asymptomatic) to an uninfected member of the community, if the latter receives a sufficient dose to overcome his or her defenses. The risk of transmission thus increases when people from different households gather in close proximity for extended periods without masks or other face coverings." (*County of Los Angeles, supra*, 61 Cal.App.5th at p. 482.) In analyzing a restaurateur's constitutional challenge to the county's mandate, the court in *County of Los Angeles* concluded that the order did not violate First Amendment freedom-of-assembly rights

19

because it did "not regulate assembly based on the expressive content of the assembly," "limiting the spread of COVID-19 [was] a legitimate and substantial government interest," and the order left open "alternative channels for assembling, i.e., videoconference or in-person socially distant gatherings with face coverings." (*County of Los Angeles*, at p. 496.)

Similarly, the District's policy did not regulate G.W.'s anti-mask speech based on its content—the policy applied to all students with only limited exemptions. The policy also had the compelling aim of stemming the spread of COVID-19 in schools. (See *Roman Catholic Diocese v. Cuomo* (2020) 592 U.S. 14, 18 [stemming the spread of COVID-19 was "unquestionably a compelling interest"]; cf. *Love v. State Dept. of Education* (2018) 29 Cal.App.5th 980, 990 ["It is well established that laws mandating vaccination of school-aged children promote a compelling governmental interest of ensuring health and safety by preventing the spread of contagious diseases."].) It was narrowly tailored in that masks only had to be worn indoors where the risk of transmission is higher, and re-opening plans left room for policy adjustments as needed based on changing COVID-19 case rates. (See *Ward v. Rock Against Racism* (1989) 491 U.S. 781, 800 ["So long as the means chosen are not substantially broader than necessary to achieve the government's interest . . . the regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative."].) There is no evidence G.W. lacked alternate ways to express her opposition to the mask policy without creating health risks, such as by voicing her disagreement while still wearing a mask, handing out leaflets to explain her protest (as the complaint alleges she did), or displaying anti-mask slogans. Therefore, even setting

20

aside that G.W.'s expressive speech occurred at school, the District's mask policy passes constitutional muster.

The fact that G.W.'s acts of "protest" occurred in a school setting reinforces this conclusion. The record shows that G.W.'s conduct "materially and substantially" disrupted the work and discipline of the school and invaded the rights of others under the student-speech standard in *Tinker*. (*Tinker, supra*, 393 U.S. at p. 513.) When G.W. repeatedly attempted to enter classrooms without a mask over the course of several weeks, teachers had to move their entire classrooms outdoors or to other indoor locations to comply with District safety policies. Teachers and administrators alike spent substantial time engaging plaintiffs in conversations about G.W.'s refusal to wear a mask, often in the presence of other students because G.W. refused to leave the classroom or campus. According to plaintiffs' own allegations, in some instances teachers expressed concern over their own safety and the safety of their family members. Unlike in *Tinker*, the extent of these disruptions exceeded "a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint[,]" and reasonably "led school authorities to forecast substantial disruption of or material interference with school activities" on school premises. (*Id.* at p. 509.) Under these circumstances, the District's mask policy was also constitutionally justified under *Tinker*.

We therefore conclude—in light of the deference owed to exercises of government authority amidst a public health emergency under *Jacobson* and the special characteristics of student speech under *Tinker*—that the District's facially neutral mask policy did not unlawfully deprive G.W. of her free speech rights, and her constitutional claims lack even minimal merit. Cases in other state and federal jurisdictions further support our conclusion. (See,

21

e.g., *Calm Ventures LLC v. Newsom* (C.D. Cal. 2021) 548 F.Supp.3d 966, 976 [collecting cases concluding that orders aimed at preventing the spread of COVID-19 serve an important and legitimate state interest]; *Bentonville Sch. Dist. v. Sitton* (2022) 2022 Ark. 80, 11 [holding that school district's mask policy had a "real or substantial relation" to protecting student health during the COVID-19 pandemic]; *Stepien v. Murphy* (D.N.J. 2021) 574 F.Supp.3d 229, 234 [holding that "the government acted within broad constitutional bounds when it enacted the in-school mask requirement" plaintiffs sought to enjoin]; *Megeso-William-Alan v. Ige* (D. Haw. 2021) 538 F.Supp.3d 1063, 1078–1080 [finding that Hawaii's mask mandate violated neither right to free speech nor right to free assembly]; *Oberheim v. Bason* (M.D. Pa. 2021) 565 F.Supp.3d 607, 618 [holding that "children do not have a fundamental right to attend school without masks on"]; *Antietam Battlefield, supra*, 461 F.Supp.3d at pp. 236–237 [finding that mask requirement did not violate right to free speech].)

## II

Lastly, we turn to plaintiffs' argument that Judge Pollack should be disqualified for demonstrating bias. We disagree.

First, plaintiffs did not properly preserve a claim of judicial bias because they did not file a disqualification motion in the trial court. (See § 170.3, subd. (c)(1) [a party who believes a judge is required to disqualify himself or herself must file a disqualification motion in the trial court "at the earliest practicable opportunity after discovery of the facts constituting the ground for disqualification"]; *Kern County Dept. of Child Support Services v. Camacho* (2012) 209 Cal.App.4th 1028, 1038 ["We conclude that appellant's disqualification arguments are forfeited by his failure to raise them below."].) Generally, a specific and timely objection to judicial misconduct is required to

preserve the claim for appellate review. (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1320 (*Seumanu*); see also *People v. Johnson* (2015) 60 Cal.4th 966, 978 (*Johnson*) [party must seek disqualification at " 'the earliest practicable opportunity' " to avoid forfeiture].) Plaintiffs rely on *Catchpole v. Brannon* (1995) 36 Cal.App.4th 237 (*Catchpole*) to argue that we should look past their failure to object. But since the Court of Appeal decided *Catchpole*, the Supreme Court has stated in clear terms that a party must object at trial to alleged judicial bias, or the claim is forfeited. (See, e.g., *Seumanu*, at p. 1320; *Johnson*, at p. 978.)

Furthermore, although plaintiffs argue they should be excused from forfeiture because an objection would have been futile, we are not persuaded. Aside from citing the possibility of "severely offend[ing]" an "already offended" court and defense counsel's "shock, or whatever reason" for failing to object, Plaintiffs point to no other grounds for why an objection would have been fruitless. Plaintiffs again rely on *Catchpole*, but the facts in that case are distinguishable because the Court of Appeal found ample evidence of judicial gender bias in the trial court. (*Catchpole, supra*, 36 Cal.App.4th at p. 249 [finding that comments made over the course of the eight-day trial "collectively create[d] the impression of judicial gender bias"].) The court's alleged "hostility" in this case did not rise to such a level that we can conclude plaintiffs would have objected in vain. Because "[t]he ritual incantation that an exception applies is not enough[,]" we conclude that plaintiffs forfeited their disqualification argument and that no futility exception applies. (*People v. Gamache* (2010) 48 Cal.4th 347, 371.)

Second, even if plaintiffs properly raised the issue of disqualification in the trial court, they forfeited it by failing to seek appellate review via a petition for writ of mandate, which is the exclusive appellate remedy. (See

§ 170.3, subd. (d) ["The determination of the question of the disqualification of a judge is not an appealable order and may be reviewed only by a writ of mandate . . . ."]; *Brown v. American Bicycle Group, LLC* (2014) 224 Cal.App.4th 665, 672 (*Brown*) ["Brown's claim is not cognizable on appeal because a petition for writ of mandate is the exclusive method by which a party may seek review of the question of the disqualification of a judge."]; *Roth v. Parker* (1997) 57 Cal.App.4th 542, 548–549 [appellant forfeited a non-statutory claim of judicial bias by "fail[ing] to seek writ review"].)

Third, even if we were to reach the disqualification claim despite its forfeiture, we would reject it. Neither Judge Pollack's disagreements with plaintiffs' approach to the case, nor the views he expressed on the merits while hearing arguments, demonstrated disqualifying bias. (*Moulton Niguel Water Dist. v. Colombo* (2003) 111 Cal.App.4th 1210, 1219–1220.) "When making a ruling, a judge interprets the evidence, weighs credibility, and makes findings. In doing so, the judge necessarily makes and expresses determinations in favor of and against parties." (*Id.* at p. 1219; see also *Brown, supra*, 224 Cal.App.4that p. 674 ["[t]he mere fact that the trial court issued rulings adverse to [plaintiff] on several matters in this case, even assuming one or more of those rulings were erroneous, does not indicate an appearance of bias, much less demonstrate actual bias"].) Although plaintiffs may take issue with Judge Pollack's "tone," his skepticism regarding their motives, and his view of the facts, plaintiffs have not shown how his views reflected a disqualifying bias. Indeed, his exchanges with plaintiffs' counsel were primarily regarding factual disputes that counsel herself asserted were "irrelevant" to their theory of the case. In that regard, unlike in *Catchpole*, there is no indication that Judge Pollack's comments prejudiced plaintiffs. (Cf. *Catchpole, supra*, 36 Cal.App.4th at p. 249 ["The judge's expressed

24

hostility to sexual harassment cases and the stereotypical attitudes and misconceptions he adopted provide a reasonable person ample basis upon which to doubt whether appellant received a fair trial."]; see *Seumanu, supra*, 61 Cal.4th at p. 1321 [considering lack of prejudice in rejecting judicial disqualification argument].)  We therefore conclude reversal is not warranted on judicial disqualification grounds.

## DISPOSITION

The order granting the anti-SLAPP motions is affirmed.  Respondents are entitled to recover their costs on appeal.

BUCHANAN, J.

WE CONCUR:

DO, Acting P. J.

RUBIN, J.